J-S15015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.M.R., A MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.L.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1612 WDA 2019 |

Appeal from the Order Entered September 27, 2019
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  No. 63-19-0863

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED MAY 11, 2020**

S.L.R. ("Father") appeals from the order dated September 24, 2019, and entered September 27, 2019, that granted the petition filed by the adoptive parents, S.R.B. ("Adoptive Mother") and G.B. ("Adoptive Father") (collectively "Adoptive Parents"), to involuntarily terminate Father's parental rights to his minor child, S.L.R. (born in July of 2015) ("Child"), pursuant to sections 2511(a)(1), (2), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.  We affirm.

The orphans' court summarized the facts of this case in its Pa.R.A.P. 1925(a) opinion:

> [Child] was born [in] July [of] 2015[] to Father and J.B. [("Mother"),] who died on November 20, 2015.  On November 20, 2015, Father was involved in a high speed chase with police in Blair County[,] while driving under the influence and without a

---

[*] Former Justice specially assigned to the Superior Court.

J-S15015-20

license. Mother and [] Child, who was only four months old at the time, were both in the vehicle. While fleeing the police, Father lost control of the vehicle resulting in an accident which caused the death of Mother. [] Child was thrown 70 feet from the vehicle resulting in a traumatic brain injury. [] Child had to be resuscitated on scene before being life-flighted to Children's Hospital in Allegheny County. In addition to the death of Mother and [] Child's severe injuries, Father was paralyzed as a result of the accident.

When it was time for [] Child to be released from the hospital, Adoptive Mother and Adoptive Father came forward and volunteered to take her into their care. Adoptive Father [is the] brother of [C]hild's late Mother. [Adoptive Parents] live in Washington County with their two [biological] sons. [] Child has lived with [] Adoptive Parents in Washington County since her release from the hospital. Upon her release, [] Child had to wear a neck brace due to unsecured ligaments in her neck and her traumatic brain injury. As a result of her injuries, … Child required surgery and the implant of a permanent shunt to regulate the fluid retention in her brain.

On March 22, 2017, after guardianship proceedings began in Blair County, Pennsylvania, a hearing was held to transfer the case to Washington County. The order of transfer set forth various provisions to facilitate a relationship between Father and [] Child. The order awarded residential custody to Adoptive Mother and Adoptive Father, but permitted contact via Skype between Father and [] Child. Father was also to set up an e-mail account to facilitate the exchange of information between the parties. A notebook was also created to be used to pass on medical information from [] [A]doptive [P]arents to Father about [] Child's health.

On March 22, 2018, Father received his sentence for vehicular homicide[,] arising out of the police chase and accident that resulted in Mother's death and [] Child's severe injuries. Father has been incarcerated since 2018 in the State Correctional Institution [("SCI")] at Laurel Highlands. Father has not had any visitation with [] Child since his incarceration. [] Child is unable to identify Father from photographs. Adoptive [P]arents have facilitated visits with [] Child's paternal grandparents. Despite visits with her grandparents, [] Child has never mentioned receiving any gifts from Father or having any communication with Father. Father has never provided [A]doptive [P]arents with any

- 2 -

financial support for [] Child. Father has never been to any doctor[] appointments or therapy appointments for … Child. Father has never visited … Child at [A]doptive [P]arents' home, he has never telephoned to talk to … Child, or to even ask how she is doing. Father has not had any direct communication with [A]doptive [P]arents since March of 2018. To Adoptive Mother's knowledge, there has been no direct contact between [] Child and Father since March of 2018.

[] Child suffers from emotional and physical trauma, as well as various developmental delays, due to the injuries she suffered in the accident. Despite the lengthy medical history of [] Child, Father has never personally asked [A]doptive [P]arents about how [] Child is progressing. Since his incarceration, Father has never contacted [A]doptive [P]arents, directly or indirectly, to arrange a visit. Prior to his incarceration, Father never made any effort to arrange a visit or to be driven to Washington County to see [] Child. Prior to his incarceration, [A]doptive [P]arents made all arrangements to facilitate visitation with [] Child and Father.

Orphans' Court Opinion ("OCO"), 12/20/19, at 1-3 (citations to record omitted).

On July 10, 2019, Adoptive Parents filed a petition for involuntary termination of Father's parental rights. On that same date, the orphans' court appointed Christine DeMarco-Breeden, Esquire, as Child's guardian *ad litem* ("GAL").[1] *See* Order, 7/10/19, at 1 (single page). A hearing date was initially

_____

[1] Pursuant to 23 Pa.C.S. § 2313(a), a child has a right to counsel in a contested involuntary termination proceeding. "During contested termination-of-parental-rights proceedings where there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests." *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). "[W]here the child's preferred outcome is not ascertainable, such as where the child is very young or is unable to express a preference, there can be no conflict between the child's legal and best interests." *Interest of M.V.*, 203 A.3d 1104, 1109 (Pa. Super. 2019) (citing *T.S.*, 192 A.3d at 1092). Instantly, we discern no conflict between Child's legal interest and best interests that would require the appointment of separate counsel. We

set for August 22, 2019, and was continued to September 24, 2019, after Father expressed his intention to contest termination. The orphans' court arranged for Father to participate in the termination hearing via teleconference, as he remained incarcerated in SCI Laurel Highlands and could not appear in person. OCO at 4. On the date of the termination hearing, Adoptive Parents filed a report of their intention to adopt Child. After the hearing, upon consideration of all the evidence and testimony presented, the orphans' court entered an order terminating Father's parental rights, citing on the record the reasons therefore. *Id. See also* N.T. Termination, 9/24/19, at 261-263.

On October 28, 2019, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). Father now presents the following sole issue for our review on appeal: "Whether the [orphans'] [c]ourt committed an abuse of discretion in finding that [] Father's incarceration and physical abilities incapacitate his ability to parent … [C]hild and that Father has made no effort to perform a parental role?" Father's Brief at 5.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence.

_____

conclude that Attorney DeMarco-Breeden dutifully represented Child in both respects.

- 4 -

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.  Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict.  We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)).  Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.  *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).  If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.  *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following:  Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights.  Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a).  Only if the court

- 5 -

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in

- 6 -

order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. [] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being; and (3) the

- 7 -

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In the case of an incarcerated parent, this Court has stated:

[T]he fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children…. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of his … potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations and quotation marks omitted). "Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010). Moreover, we note that "[t]he

- 8 -

cause of incarceration may be particularly relevant to the [s]ection 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were 'part of the original reasons for the removal' of the child." *Id.* (quoting *In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008)).

Here, Father contends that he had a relationship with Child prior to his incarceration and that he "did what he could during his incarceration to maintain the parent-child relationship." Father's Brief at 10. In support of his claim, Father alleges that, while incarcerated, he called Child weekly from prison, sent the occasional card to Child in care of her paternal grandmother, and that he had been working with a counselor at the prison regarding Skype or establishing some other form of contact with Child. *Id.* Father also states that he did not write to Child at the Adoptive Parents' address "because he did not have their address and he did not think that they would appreciate him sending things there[,] given [their] ill will towards him." *Id.*

Additionally, Father claims that the orphans' court erred in finding that his "incapacity could not be remedied." *Id.* at 11. Father argues that he is due to be released from prison in two years and that he "can take care of his daily needs[,] as well as [Child's]." *Id.* at 11-12. He asserts that Adoptive Parents failed to meet their burden under section 2511(a)(2), as they provided no evidence regarding the impact that his additional two years in prison would have on Child or that he could not care for Child. *Id.* at 12. The record clearly belies Father's claims.

Multiple witnesses were presented at the termination hearing, including Adoptive Mother, Adoptive Father, and Bonnie McNally-Brown, Child's therapist. The orphans' court relied heavily on the extensive testimony of these three witnesses in reaching its determination to terminate Father's parental rights. OCO at 7. In addition to testifying about Father's criminal actions, which not only led to the death of Mother and severe injuries to Child, but also his incarceration, Adoptive Mother testified,

> that since Father's incarceration in 2018[,] … Father has not had any personal contact with [] Child. [She] further testified that, despite facilitating visits with [the] paternal grandparents, [] Child has never mentioned speaking with Father or receiving any form of gifts from Father. Adoptive Mother testified that Father has never provided any form of financial support for [] Child. [She] also testified that Father has never been to any doctor[] appointments, has never called to talk with [] Child, and has never called to simply ask about … Child's health, safety, or welfare. Adoptive Mother additionally testified that [] Child does not recognize Father from his photograph.

*Id.* (citations to record omitted). Prior to his incarceration, Father never once made an effort to be driven to Washington County to visit with Child. *Id.* Instead, Adoptive Father was the one who drove Child to visit with Father. *Id.*

> Adoptive Father would drive 85 miles and approximately an hour and twenty-five minutes to a meeting point so that [] Child could visit [with her] paternal grandparents and Father. [] Child would then be taken to [the] paternal grandparents' home, an additional hour away from the meeting point. Adoptive Father added that, prior to incarceration, Father was present for two pickups, but he never left the vehicle to talk with Adoptive Father and he never saw any affectionate interaction between [] Child and Father.

> Adoptive Father testified that he has never received any phone calls, letters, or cards from Father for [] Child. [He] further testified that, despite continuing to facilitate a relationship with [the] paternal grandparents following Father's incarceration, [] Child has never mentioned speaking to Father on the phone or [S]kyping with Father while visiting with [them].

*Id.* at 8 (citations to record omitted). Additionally, Ms. McNally-Brown testified that Child "has never once mentioned Father in any of their counseling sessions." *Id.* (citation to record omitted).

At the hearing, Father admitted to overdosing at least twice since the accident, by improperly consuming Fentanyl patches. *Id.* Moreover,

> Father admitted that he did not bother to ask for an address from [A]doptive [P]arents[,] because he did not want to go to their home to visit [] Child. Rather, he wanted them to bring [] Child to him. [He] admitted that he made little to no effort to ascertain … Child's address to write letters or send cards. Father admitted that between his sentencing on March 22, 2018[,] and his incarceration [in] April of 2018[,] that he had access to the internet and telephones, but he did not attempt to [S]kype or ascertain the correct address. Father further testified that during his time of incarceration, he has sent possibly two cards, but that neither of them were addressed to [] Child's home. Father acknowledged that he will not be released from incarceration for at least two more years.[2] [H]e additionally admitted that he never attended any doctor[] appointments or therapy sessions prior to his incarceration.

*Id.* at 8-9 (citations to record omitted). When asked by the court for an example of how he has acted in a parental role towards Child, Father was not able to offer any such testimony. *Id.* at 9.

---

[2] Father agreed that it would not be in Child's best interest to wait for him to get out of jail in 2½ years, "because we're not even certain that is what's going to happen." N.T. Termination at 151.

After consideration of all the testimony and evidence presented at the termination hearing, the orphans' court found the testimony of Adoptive Parents, as well as Child's therapist, to be credible, and it opined:

The testimony provided established sufficient grounds to terminate Father's parental rights, especially in light of Father's own admission that he has failed to act in a parental role…. The testimony clearly established that Father has made little to no effort to be a part of … Child's life. Father failed to provide any evidence that he acknowledged … Child's birthdays or holidays or that he sent any form of gifts, letters, or cards. Father made no attempt to call … Child before or after his incarceration. [] Child suffers from severe medical injuries due to the accident caused by Father, but Father has made no effort to be a part of her recovery. To the contrary, [A]doptive [P]arents have stepped into the parental role since her release from the hospital and have done everything to care for … Child.

*Id.* at 9-10. The court added:

Father has shown no interest in [] Child's well-being, though her injuries were caused by Father's own recklessness. [] Child needs to have a stable home environment, especially in light of her serious medical needs, and it is clear that Father cannot provide such an environment now or in the near future, nor has he demonstrated a desire to do so.

*Id.* at 10.

The orphans' court also addressed the relevance of Father's incarceration in regard to its decision:

The orphans' court acknowledges that Father's incarceration is not a sufficient reason alone to terminate his parental rights. However, … it was not Father's incarceration alone that resulted in the termination of his parental rights. The testimony presented clearly indicated that Father had failed in his parental role prior to his incarceration. [He] continued to neglect his parental responsibilities subsequent to his incarceration.[36] Father did not offer sufficient evidence to demonstrate that he put forth any

- 12 -

effort to overcome the obstacles which were the direct result of his own actions.

> <sup>36</sup> Father claimed that he had been calling his mother's house from the SCI to speak with [] Child during her monthly visits with [her] paternal grandparents. The orphans' court did not find this testimony credible…. Child never mentioned the alleged communications with anyone, including her therapist. Father offered no corroborating evidence for the calls, such as phone records of his mother's account or from the SCI.
>
> Furthermore, the orphans' court did not terminate Father's parental rights solely because he suffers from paralysis, as a result of the horrific accident. Father's incapacity in this regard was merely one factor in the totality of the circumstances that resulted in his parental rights being terminated. Father will be incarcerated for at least two more years, he suffers from paralysis that would make it difficult for him to care for the medical needs of [] Child, and the evidence indicates that Father has not fulfilled his parental role in any case. The orphans' court found that the totality of the circumstances necessitated the termination of Father's parental rights. Upon Father's act of gross negligence on the night of the fatal accident in 2015, the disruption of the family [had] already occurred, [] [M]other was killed, Father was paralyzed, and [] Child suffered severe injuries, from which she is still recovering, and there is no reasonable prospect for reuniting it.

*Id.* at 12-13 (internal quotation marks and footnote omitted). We deem the orphans' court's determination under section 2511(a)(2) to be well-supported by the record, and we discern no abuse of discretion.

As for its analysis under section 2511(b), Father argues that the orphans' court failed to inquire as to the bond between him and Child. Father also avers that the court erred in relying on the testimony of Child's therapist in making its determination to terminate Father's parental rights. Father's Brief at 12-13. We deem Father's claims to be wholly without merit.

Contrary to Father's statement, it is clear that the orphans' court considered the bond, if any, between Father and Child; however, the court found credible Ms. McNally-Brown's testimony that she does not believe there to be any bond between Father and Child and that there is no relationship there to preserve. OCO at 11. We must defer to the orphans' court credibility findings. *See In re M.G., supra*. Moreover, Ms. McNally-Brown observed a bond and affection between Child and Adoptive Parents. *Id.* This is supported by Adoptive Mother's testimony that Child calls her "Mommy[,]" and that "[s]he always runs to me, like I'm her safe place." *Id.* Adoptive Mother added:

> [W]e snuggle, we play, we do things that you do with your children. And honestly, there's no difference between [Child] and my biological children to me, in my heart. And … all I do is try to do the best for her, no matter what she needs despite my personal discomfort or feelings.

*Id.* (citing N.T. Termination at 33). Adoptive Mother also testified that Child loves Adoptive Father "very much," that "[h]e's really wonderful with her[,]" and that Child and Adoptive Parents' two biological children "love each other so much [and] … they adore each other." N.T. Termination at 34.

The orphans' court concluded that Child's welfare was best served by terminating Father's parental rights. In support of its decision, it opined:

> Adoptive [P]arents provide all the love, security, and comfort that … Child needs[,] especially in light of the trauma she has endured since an extremely young age. In contrast, Father has not offered anything to demonstrate that he has even attempted to provide for … Child's needs and her overall well-being. Adoptive [P]arents have been meeting all of [] Child's emotional, mental, and physical needs since she was released from the hospital, and it was

appropriate to terminate Father's parental rights to allow [A]doptive [P]arents to be legally recognized as [] Child's parents, and to provide permanency for [] Child.

OCO at 11-12. As there is competent evidence in the record to support the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude that the court did not abuse its discretion as to section 2511(b).

Accordingly, we affirm the order terminating Father's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2020